**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| In re: <br><br> EASTERN COLORADO SEEDS, LLC, <br><br> Debtor. | Chapter 11 <br><br> Case No. 25-10244-JGR |
| In re: <br><br> ECS FARMS, LLC, <br><br> Debtor. | Chapter 11 <br><br> Case No. 25-10247-JGR <br><br> Jointly Administered Under <br> Case No. 25-10244-JGR |

**AMERICAN AGCREDIT'S OBJECTION TO EASTERN COLORADO SEEDS, LLC'S MOTION FOR ENTRY OF (I) INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL; (II) FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION; (IV) SETTING A FINAL HEARING ON USE OF CASH COLLATERAL; AND (V) GRANTING RELATED RELIEF**

American AgCredit, FLCA ("AAC FLCA") and American AgCredit, PCA ("AAC PCA"), (AAC FLCA and AAC PCA collectively, including with their parents, subsidiaries, and affiliates listed in the applicable Loan Documents, "American AgCredit"), by and through its undersigned counsel, hereby files its *Objection* (the "ECS Cash Collateral Objection") to *Eastern Colorado Seeds, LLC's Motion For Entry Of (I) Interim Order Authorizing Use Of Cash Collateral; (II) Final Order Authorizing Use Of Cash Collateral; (III) Granting Adequate Protection; (IV) Setting A Final Hearing On Use Of Cash Collateral; And (V) Granting Related Relief* [Dkt. No. 35] (the "ECS Cash Collateral Motion") filed by the Debtor, Eastern Colorado Seeds, LLC ("Eastern Colorado Seeds" or "Debtor").

American AgCredit cooperated in good faith with Eastern Colorado Seeds through two restructuring agreements in the spring and fall of 2024 to aid Eastern Colorado Seeds in its effort to sell Collateral (defined below), right-size its operations, and obtain alternative financing. To

1

further continue that endeavor, now in this Chapter 11 proceeding that American AgCredit is effectively financing through deferred payments and the Debtor's use of Cash Collateral (defined below), American AgCredit requires that Eastern Colorado Seeds provide American AgCredit adequate protection as detailed below in return for Eastern Colorado Seeds using the Collateral.

## BACKGROUND

**I.    The Loan History**

1.     Since 2018, American AgCredit extended credit to Eastern Colorado Seeds, as well as to debtor ECS Farms, LLC, a Colorado limited liability company ("ECS Farms"), and non-debtors Clayton R. Smith ("Clayton") and Christine L. Smith ("Christine") (Eastern Colorado Seeds, ECS Farms, LLC, Clayton, and Christine collectively the "Borrowers") and also Pinnacol Holdings LLC, a Colorado limited liability company ("Pinnacol") and High Plains Ag Service, Inc., a Colorado corporation ("High Plains") (Pinnacol and High Plains collectively the "Additional Guarantors"), pursuant to certain loan documents ("Loan Documents"), soon to be attached to American AgCredit's Proof of Claim and incorporated herein by reference.

2.     Under the Loan Documents, American AgCredit made extensions of credit in these cases denoted by the following seven (7) loan numbers: (1) 9000056726; (2) 9002065895; (3) 9000057003; (4) 9000056727; (5) 9002073259; (6) 900006488; and (7) 9002101707, memorialized in the promissory notes, amendments to promissory notes, master loan and membership agreements, supplemental loan agreements, continuing guaranties, lease agreements, and associated riders, addenda, and exhibits, including as supplemented, modified, and amended, all as detailed in the Loan Agreements (such extensions of credit, collectively the "Loans").

3.     The Loans are secured by the deeds of trust, security agreements, assignments of rents, fixture filings, mortgages, and associated riders, addenda, and exhibits, including as supplemented, modified, and amended, recorded in the real estate records of Kit Carson County,

2

Colorado, Moore County, Texas, and Curry County, New Mexico, further perfected through UCC financing statements, continuations, and effective financing statements, and associated riders, addenda, and exhibits, including as supplemented, modified, and amended, recorded in the offices of the secretaries of state of Colorado, Texas, and New Mexico, granting security interests in the property and assets described therein to the Lender (collectively the "Commercial Security Agreements").

4. As more fully stated in the Loan Documents, American AgCredit possesses a first-priority, perfected, continuing security interest, general lien upon, collateral assignment of, and right of set-off against all of the Borrowers' and Additional Guarantors' right, title, and interest as to all or no less than substantially all assets of the Borrowers and Additional Guarantors (collectively, the "Collateral").

5. The Collateral includes, but is not limited to, all of the Borrowers' and Additional Guarantors' cash, accounts, and profits, proceeds, and revenues from inventory and equipment, all of which constitute "cash collateral" as that term is defined in 11 U.S.C § 363(a) (all such Collateral, the "Cash Collateral"). For the avoidance of doubt, the Debtor has no cash other than the Cash Collateral.

## II. Restructure – Spring 2024

6. On April 23, 2024, American AgCredit entered into the restructuring Supplemental Loan Agreement ending in x1707, pursuant to American AgCredit's Distressed Loan Policy, with Eastern Colorado Seeds, the mutual intent of which was to provide Eastern Colorado Seeds with additional, limited runway so that Eastern Colorado Seeds could sell Collateral while also obtaining takeout financing, notwithstanding prior defaults:

> 3. Borrower understands and agrees that the loan restructure evidenced by the Restructured Loan Documents is being done at Borrowers' request. Lender does not represent or warrant that the operations of the Borrower will become financially viable as a result of this loan restructure.
>
> 4. Borrower understands and agrees that should their/his/her restructured loan(s) remain distressed and they/he/she defaults under the terms of the Restructured Loan Documents, Borrower may not be entitled to any further or additional Borrower Rights Policies to restructure either under the Farm Credit Act of 1971, as amended, or under the Distressed Loan Restructuring Policy and Lender may, in its sole discretion, begin foreclosure proceedings.
>
> 6.5 Sale of real estate. Borrower shall sell real estate with all proceeds submitted to Lender to reduce the Borrowing Base deficit and to pay down all or a portion of the outstanding principal balance of loans with Lender at Lenders sole and absolute discretion by September 30, 2024.

(*See* forthcoming American AgCredit Proof of Claim, citation forthcoming).

7. The Supplemental Loan Agreement ending in x1707 has a maturity date of December 1, 2024, and is cross–collateralized and cross–defaulted with all of the other Loan Agreements, including those in which Clayton and Christine are parties, as follows:

> The collateral for this Loan also secures the obligations related to loan number(s) 009000056726, 009000057003 and 009002065895 with this Lender. Additionally, the collateral related to loan number(s) 009000056726, 009000057003 and 009002065895 with Lender will be collateral for this Loan.
>
> 6.1 Cross Default Provision. Any Default on this Loan will be an Event of Default on the loans of Clayton Russel Smith and Christine Laurine Smith with American AgCredit, ACA and its subsidiaries. Any Default on the loans of Clayton Russel Smith and Christine Laurine Smith with American AgCredit, ACA and its subsidiaries shall be an Event of Default on this Loan.
>
> 7. **DEFAULT.** Borrower is in default on this Agreement upon the occurrence of any of the events described as an Event of Default in the Master Agreement. In addition, any default on this Loan will be an Event of Default on all loans secured by the Collateral described in Paragraph B above. A default on any of the loans secured by the Collateral described in Paragraph B above will be an Event of Default on this Loan.

*Id*. at forthcoming citation.

8. When the Borrowers and Additional Guarantors defaulted on the terms and conditions of the Supplemental Loan Agreement ending in x1707, those defaults, in addition to other defaults, resulted in the Forbearance Agreement ("Forbearance Agreement") that gave the

4

Borrowers and Additional Guarantors additional opportunity and timing to sell Collateral and obtain alternative, takeout financing.

### III. The Fall 2024 Forbearance Agreement

9. In a good-faith effort to assist the Borrowers and Additional Guarantors in restructuring the Loans, on September 4, 2024, American AgCredit, the Borrowers, and the Additional Guarantors entered into the Forbearance Agreement.

10. As stated in the Forbearance Agreement, the Borrowers and Additional Guarantors consented and agreed that the Borrowers and Additional Guarantors have been in and remain in a state of default under the terms and conditions of the Loan Documents.

11. Through the Forbearance Agreement, the Borrowers and Additional Guarantors acknowledged and agreed that: (a) the Borrowers and Additional Guarantors have no defenses of any nature whatsoever to collection of the Indebtedness (as that term is defined in the Forbearance Agreement), enforcement of the terms of the Loan Documents, or the Forbearance Agreement; (b) the Borrowers and Additional Guarantors have no claims, counterclaims, or offsets against American AgCredit or its agents or affiliates relating to or in connection with the Loan Documents or the Forbearance Agreement; (c) the Borrowers and the Additional Guarantors have no defenses, claims, counterclaims, or offsets to collection of the Indebtedness or enforcement of the terms of the Loan Documents, including, but not limited to, statutes of limitation and equitable defenses such as laches, waiver, or estoppel; and (d) the Loan Documents, as modified by the Forbearance Agreement, are enforceable against the Borrowers and Additional Guarantors pursuant to their terms.

12. Through the Forbearance Agreement, the Borrowers and Additional Guarantors likewise agreed and acknowledged that American AgCredit has its first-priority continuing, perfected, security interest in the Collateral.

13. Almost immediately after the execution of the Forbearance Agreement, the Borrowers and Additional Guarantors caused multiple Forbearance Defaults (as that term is defined in the Forbearance Agreement), resulting in American AgCredit needing to obtain a receiver.

### IV. The Receivership Proceeding

14. In December 2024 American AgCredit initiated a receivership proceeding before the District Court for Kit Carson County, Colorado, Case No. 2024CV30026 (the "Receivership Proceeding").

15. The Forbearance Defaults included several instances of non-payment by the Borrowers and Additional Guarantors, in addition to a third party creditor pursuing a garnishment proceeding that would have at least frozen, if not seized, all of Eastern Colorado Seeds' liquidity for purposes of it operating sometime this winter. (*See below* Receiver Motion, ¶¶ 14.- 17.)

16. On December 16, 2024, the state court issued its *Order Appointing Receiver* (the "Receivership Order"), appointing Cordes & Company, LLP (the "Receiver") as receiver over, as more specifically stated in the Receivership Order, the Collateral and the *res* of Christine and Clayton. A true and correct copy of the Receivership Order, along with the *Motion for Appointment of Receiver Ex Parte* (the "Receiver Motion") and Hoffman Declaration ("Hoffman Declaration") incorporated herein by reference, is attached hereto as Exhibit A. The state court also found American AgCredit to be the first-priority, perfected, secured creditor of the Borrowers and Additional Guarantors, secured in the Collateral:

> 12. Any and all assets, including any land, improvements, personal property, fixtures, accounts receivable, accounts, personal property, claims and causes of action against third parties, revenues, royalties, issues, profits, and income thereof, including those assets as follows, may be referred to as the "Collateral," more fully defined in the Loan Documents, pledged by the Borrowers to the Lender and pledged by the Additional Guarantors to the Lender as more fully stated in the Loan Documents, with Lender being the first-priority, perfected, secured creditor of the Borrowers and Additional Guarantors as more fully stated in the Loan Documents and the Forbearance Agreement, secured in all Collateral, including but not limited to the following:

Receivership Order, ¶ 12.

17. To date, in accordance with the Receivership Order, the Receiver maintains possession and control over both the *res* of Clayton and Christine and over the Collateral pledged by non-debtors Pinnacol and High Plains, protecting all of the same against both dismantling by third party creditors and mismanagement as attested to by Mr. Hoffman in the Hoffman Declaration, at paragraphs 7-13 and 18, which includes Citations to Show Cause and a third party creditor seeking sanctions against Eastern Colorado Seeds and Clayton for failure to comply with subpoenas in a hearing in January 2025.

V. **The Instant Bankruptcies**

18. On January 16, 2025 (the "Petition Date"), Eastern Colorado Seeds and ECS Farms filed petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Colorado.

19. As of the Petition Date, the Borrowers and Additional Guarantors are jointly and severally liable to American AgCredit in the amount of $16,917,219.55 valued as of November 30, 2024. Interest and other costs and expenses, including attorney's fees, continue to accrue under the Loan Documents and the Forbearance Agreement.

20. It is indisputable that American AgCredit is significantly undersecured as the amount owed to American AgCredit is related to the estates of Eastern Colorado Seeds and ECS Farms, individually and combined.

## ARGUMENTS

**VI. American AgCredit Does Not Consent to the Use of Cash Collateral Without Protection and Adequate Assurance.**

21. A debtor may not use cash collateral unless: (i) each entity that has an interest in the cash collateral consents; or (ii) a court authorizes such use in accordance with 11 U.S.C. § 363. *See In re Bluejay Properties*, LLC, 512 B.R. 390, at *4 (Bankr. App. 10th Cir. 2014) (discussing 11 U.S.C. § 363(c)(2) and observing that the "use, sale, or lease of cash collateral (as defined in § 363(a)) requires either the consent of creditors with a secured interest in such collateral, or court approval"). Additionally, "upon request of a secured party, § 363(e) requires [a] court to prohibit or condition [the debtor's] use, sale, or lease of [cash collateral] as is necessary to provide adequate protection of the creditor's interest." *Id.* (internal quotation marks omitted).

22. The Bankruptcy Code names three basic forms of adequate protection: (i) cash payments to the extent that the debtor's use of property results in a diminution in value of a creditor's interest in such property; (ii) additional or replacement liens to the extent that the debtor's use of property will result in a diminution in value of a creditor's interest in such property; and/or (iii) such other relief resulting in the creditor's realization of the "indubitable equivalent" of its interest in the debtor's property. *See generally* 11 U.S.C. § 361. These forms of adequate protection are, however, illustrative, as "adequate protection is a concept which is to be decided flexibly on the proverbial case-by-case basis." *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987) (internal quotations omitted); see also 3 *Collier on Bankruptcy* ¶ 363.05 (16th 2024) (observing that the Bankruptcy Code's examples of adequate protection "are not intended to be limiting, and the circumstances of the case will dictate the necessary relief to be given").

23. At bottom, adequate protection assures a secured creditor that "its collateral is not depreciating or diminishing in value," which "[preserves] the value for which the creditor

8

bargained prebankruptcy." *In re CST Group, Inc.*, 2013 WL 2250210, at *2 (Bankr. D. Colo. May 22, 2013) (collecting cases and citing House Rep. No. 95–595, 95th Cong., 2d Sess. 53, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6295). Thus, while flexibility is a relevant consideration, the risks posed to a secured creditor's position are "critical to the issue of adequate protection[.]" *See In re O'Connor*, 808 F.2d at 1398 ("To encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible . . . [but] care must be exercised to insure that the vested property rights of the secured creditor and the values and risks bargained for by that creditor prior to bankruptcy are not detrimentally affected.")

24.  For one example, Section 552(b) provides that, here where American AgCredit has a first-priority, perfected, secured interest in proceeds earned in the post-petition period, including proceeds from the sale of inventory, American AgCredit has the same priority lien in those proceeds in the post-petition period, the Cash Collateral in this case. *In re Inv. Hotel Properties, Ltd.*, 109 B.R. 990 (Bankr. D. Colo. 1990); *In re Anderson*, 137 B.R. 819, 822 (Bankr. D. Colo. 1992).

25.  American AgCredit is significantly undersecured, subject to further valuation and American AgCredit reserving all rights. In this instance, in the very least, American AgCredit requires superpriority administrative claim status to the extent of diminution in its Collateral while the Debtor uses American AgCredit's Cash Collateral, replacement liens over the same in the post-petition period, a detailed budget with firm guardrails, monthly cash payments, and a surcharge waiver due to American AgCredit's Cash Collateral already preserving the estate, all as more fully stated in the relief requested below.

26.  Debtor's offer of only a replacement lien and only to the extent of diminution of value of Collateral is inadequate where American AgCredit is owed no less than $16,917,219.55

9

against Collateral of much less value, with American AgCredit financing the bankruptcy estate through deferred monthly payments otherwise owed to American AgCredit under the Loan Agreements.

## VII. Eastern Colorado Seeds Has Not Offered Adequate Protection

27. As noted above, Section 361 of the Bankruptcy Code specifies three non-exhaustive forms of adequate protection:

(i) cash payments to a creditor to the extent that the debtor's use of property results in a diminution in value of a creditor's interest in that property;

(ii) additional or replacement liens to the extent the debtor's use of property results in a diminution in value of a creditor's interest in such property; and/or

(iii) such other relief resulting in the creditor's realization of the "indubitable equivalent" of its interest in the debtor's property.

*See In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987) (when considering adequate protection, "the first effort of the court must be to insure the value of the collateral will be preserved").

### A. The Debtor's Proposed Order Does Not Provide Sufficient Transparency.

28. The Debtor offers to provide only a weekly budget-to-actual for the prior week's receipts and expenses.

29. In this case, the Debtor agreed in the prior Forbearance Agreement to provide more robust reporting, including cash flows and balance sheets, which is assistive to American AgCredit in providing insight into operations in which management, in particular inventory reporting, has been an ongoing issue for at least one year.

30. For example, since the summer of 2024, there has been an unexplained, high value discrepancy between the Debtor's various reports of the value of the grain it has in inventory. The

CORE/3500155.0064/195641442.1

Debtor's proposal would never disclose reporting in which the Court or creditors could determine whether there are further issues with inventory valuation and reporting.

### B. The Debtor's Proposed Budget is Deficient in Protections.

31. A ten percent (10%) variance in budgeting is a wide variance where Debtor's management has been problematic for more than a year, resulting in the state court *ex parte* entering the Receivership Order within hours of the Receiver Motion being filed. With every nickel of cash being American AgCredit's Cash Collateral, tighter restrictions and oversight on budgeting are more than appropriate in return for the Debtor using any Cash Collateral.

### C. The Debtor is Not Providing Adequate Protection Payments Despite Net Positive Cash Flow.

32. The Debtor's proposed budget shows $40,000.00 of available net cash flow at the end of March and April 2025, yet the Debtor is not offering any adequate protection payments to American AgCredit. This is also while the Debtor is seeking to reinstate each Christine's and Clayton's salaries of over $90,000.00 each from an operation that has not had a net positive cash flow since at least the spring of 2024.[1]

33. American AgCredit respectfully argues that the Debtor proceeding to use its Cash Collateral to compensate principals and fund the bankruptcies without providing adequate protection payments when there is projected to be net positive cash flow starting in March 2025 is inappropriate.

---

[1] American AgCredit respectfully requests that the Court consider this as an objection to Eastern Colorado Seeds, LLC's *Motion for Entry of Order Authorizing Debtor to (A) Pay Prepetition Wages, Salaries and Other Compensation; (B) Continue Employee Benefit Programs; and (C) For Related Relief* [Dkt. No. 37] to the extent the same seeks to compensate Clayton and Christine more than the amount American AgCredit asserts is appropriate herein.

**RELIEF SOUGHT**

WHEREFORE, American AgCredit respectfully requests the Court enter an order:

(a) denying the ECS Cash Collateral Motion, or, alternatively;

(b) conditioning the use of any Cash Collateral upon:

    i. the Debtor, in accordance with Sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, paying American AgCredit in the form of a wire, ACH payment, or cash, adequate protection payments in an amount equal to the following no later than the last business day of each month;

        A. $0 in month one (February 2025);

        B. $20,000.00 in month two (March 2025); and

        C. $20,000.00 in each month thereafter;

    ii. in accordance with Sections 361, 363, and 552(b) of the Bankruptcy Code, the issuance of valid, automatically perfected, continuing, unavoidable, and enforceable replacement liens (the "Replacement Liens") in favor of American AgCredit, to the same extent and priority as the prepetition liens in the Collateral (including Cash Collateral), as more fully described in the Loan Documents, over the Borrowers' and Additional Guarantors' assets that were in existence prior to the commencement of this Bankruptcy Case or have been or may be acquired by the Borrowers and Additional Guarantors after the commencement of the Bankruptcy Case, wherever such assets may be located, and without regard for the "equities of the case" exception;

    iii. the preservation of American AgCredit's right to credit bid as to any item of Collateral, in accordance with Loan Documents and Section 363(k) of the Bankruptcy Code;

    iv. in accordance with Section 507(b) of the Bankruptcy Code, the granting of a continuing superpriority claim (the "Superpriority Claim") in the amount of the Debtor's cumulative use of Cash Collateral during this bankruptcy, to the extent the Replacement Liens are insufficient to provide adequate protection against the diminution, if any, in the value of American AgCredit's interest in any Collateral resulting from the Debtor's use of Cash Collateral, such Superpriority Claim being senior in priority of payment over all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, excepting only reasonable carve-outs for committee and estate professionals;

    v. requiring the Debtor providing American AgCredit with a weekly prospective cash flow statement, prepared in good faith, in a form

12

          reasonably acceptable to American AgCredit, based upon assumptions and estimates that the Debtor believes to be reasonable, and providing the actual weekly cash flow statement to American AgCredit by no later than 5:00 p.m. MDT each Wednesday for the prior week via electronic mail, as directed;

    vi.    requiring the Debtor providing American AgCredit with a bi-weekly inventory accounting report, in a form reasonably acceptable to American AgCredit, no later than 5:00 p.m. MDT each Wednesday for the prior bi-week via electronic mail, as directed, with American AgCredit having the ability to inspect any inventory and any other contracts, security agreements, or similar agreements the Debtor entered or is entering into;

    vii.    requiring the Debtor's strict compliance with an amended version of the budget, subject to the following modifications and constraints:

        A.    the Debtor may not vary from the projected spending by more than 5 percent per category where the projected spending is $2,000.00 or less, and may not vary from the projected spending by more than 3 percent as to any other category (the "<u>Permitted Variances</u>");

        B.    should the Debtor determine a need to vary from the Budget as to any item in excess of the Permitted Variances, the Debtor must provide written notice by email to American AgCredit and its counsel and obtain American AgCredit's approval thereof;

        C.    the Debtor may not compensate Clayton and Christine in an amount of more than $<u>8,500.00</u> in the aggregate on a combined basis in any calendar month; and

        D.    the Debtor may not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Collateral, other than in the ordinary course of business consistent with past practice;

    viii.    ordering that no costs or expenses of administration of this bankruptcy or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to Section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of American AgCredit; and

(c)    Granting such other and further relief as is just, equitable, and proper.

Dated: January 22, 2025 /s/ *Lucas L. Schneider*
Lucas L. Schneider (#48125)
STINSON LLP
1144 15th Street
Suite 2400
Denver, CO 80202
Telephone: (303) 376-8414
lucas.schneider@stinson.com
Attorneys for American AgCredit

CORE/3500155.0064/195641442.1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing ECS Cash Collateral Objection was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the attorneys of record in this case, in compliance with the Federal Rules of Bankruptcy Procedure and the Court's Local Rules.

Dated: January 22, 2025  /s/ *Lucas L. Schneider*
Lucas L. Schneider
STINSON LLP
1144 15th Street
Suite 2400
Denver, CO 80265
Telephone: (303) 376-8414